## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 19 2019, 10:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Katherine N. Worman
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of: H.A., A.A., Ri.A., and Ro.A. (Minor Children),

and

R.A. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Plaintiff.*

February 19, 2019

Court of Appeals Case No.
18A-JT-2107

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

The Honorable Renee A. Ferguson, Magistrate

Trial Court Cause No.
82D04-1711-JT-2195
82D04-1711-JT-2196
82D04-1711-JT-2197
82D04-1711-JT-2198

**Tavitas, Judge.**

# Case Summary

R.A. ("Father") appeals the trial court's termination of his parental rights to H.A., A.A., Ri.A., and Ro.A. We affirm.

# Issue

Father raises several issues, which we restate as:

I. Whether the trial court properly admitted certain evidence at the termination hearing.

II. Whether the evidence is sufficient to support the termination of Father's parental rights.

# Facts

Father and As.A. ("Mother") are the parents of Ro.A., who was born in October 2007; A.A., who was born in July 2009; H.A., who was born in October 2010; and Ri.A., who was born in June 2014 (collectively, "the Children"). On July 8, 2016, the State charged Father with two counts of child molesting, as Class A felonies, for molesting H.A. and A.A. In November 2016, Mother left the three older Children with a friend and refused to take the Children back.

On November 23, 2016, the Vanderburgh County Department of Child Services ("DCS") filed petitions alleging that each of the Children were children in need of services ("CHINS") due to: (1) Father's incarceration for sexually abusing

two of the Children; (2) Mother's refusal to take custody of the Children; (3) Mother's failure to address the Children's medical needs; and (4) Mother's failure to provide the Children with a safe and appropriate home. After a hearing, the trial court found that the Children were CHINS. A January 2017 dispositional order required Father to notify DCS upon his release from incarceration and ordered Mother to participate in certain services. The Children have resided in foster homes since the November 2016 removal from Mother's care.

[5] In November 2017, DCS filed petitions to terminate Father's and Mother's parental rights.[1] A hearing was held in February and May 2018. At that time, Father remained incarcerated on the pending child molestation charges. Father participated in the hearing by telephone.

[6] Tarita Moore, a family case manager for DCS, testified that she first met the Children in 2016 when DCS received a hotline call about the family. Over Father's objection, Moore testified that, upon arriving, H.A. and A.A. almost immediately told Moore that "their Dad was in jail for molesting them." Tr. Vol. II p. 66.

[7] Hilary Bemis, a family case manager for DCS, testified that Ri.A. goes to a therapeutic preschool, where "he receives most of his services, which includes

---

[1] Mother's parental rights were terminated by default. On appeal, DCS conceded that the case should be remanded to the trial court for further proceedings. *See A.A. v. Ind. Dep't of Child Services*, No. 18A-JT-527 (Ind. Ct. App. July 9, 2018).

speech therapy, physical therapy, [and] occupational therapy." *Id.* at 56. He also sees physicians at Riley Hospital due to his club feet. H.A. and A.A. receive weekly skills training and individual therapy. Ro.A. receives weekly individual therapy.

[8] Stephanie Whalen, a community resource specialist with Southwestern Behavioral Healthcare ("Southwestern"), testified regarding the skills training that she provided to H.A. and A.A. beginning in January 2017. Whalen worked with H.A. and A.A. on social skills, coping skills, personal boundaries, personal space, and how to follow rules and directions. Over Father's objection, Whalen testified that, according to the foster mothers, one of the girls exposed or pulled down another foster child's underwear and one of the girls got on another girl in a "humping position." *Id.* at 44.

[9] Mendy Martin, social worker and therapist with Southwestern, also testified regarding her work with H.A. and A.A. Over Father's objection, Martin testified that H.A. and A.A. had separately disclosed that Father "had touched their bad spot." *Id.* at 49. Through Martin's testimony, the State also sought to admit Exhibit F and Exhibit G, which were H.A.'s and A.A.'s medical records from Southwestern. Over Father's objection, the trial court admitted the exhibits.

[10] Ashley Williams, a therapist with Maglinger Behavioral Health Services, testified that she has provided therapy to Ro.A. Ro.A. told Williams that Ro.A. "should be in jail" because Father "made him have sex with his sisters."

*Id.* at 81. Ro.A. described watching videos of people having sex, described Mother and Father having sex, and reported that Father had sex with his sisters. Ro.A. also reported that Father "made him put his privates . . . on his sister's privates and made him move around." *Id.* Ro.A. told Williams that Mother and Father "rubbed his penis at the same time and they made him pee in a cup [and] the pee was different than when it's in [a] toilet." *Id.* at 82. Father also made Ro.A. touch Father's penis, and Mother videotaped these acts. Finally, Ro.A. reported that Father made him "kiss his sister's vagina" and that Father also "kissed his sister's vagina." *Id.*

[11] Ro.A. stated that seeing his sisters "triggered" him and made him feel "weird and itchy." *Id.* at 83. As a result, sibling visitations with his sisters were stopped, and Ro.A. has made progress. According to Williams, "[Ro.A.] has made the statement that his real Mom and real Dad should be in prison. This child went from idolizing [them] to taking the blame to recognizing that his real Mom and Dad broke the law and they should be in prison. That's significant progress in a child." *Id.* at 86. Williams testified that it is not in Ro.A.'s best interest to have contact with Father.

[12] Father denied sexually molesting H.A., A.A., and Ro.A. and denied observing Mother engage in inappropriate sexual activity with the Children. Father claimed that Ro.A. had a "history of deceptive problems" and "has exaggerated and made up a lot of stories over the years." *Id.* at 28. Father testified that he touched A.A. and Ro.A. only in the "medical sense." *Id.* at 33, 35.

[13] After the hearing, the trial court issued findings of fact and conclusions of law as follows:

\* \* \* \* \*

17. Father is currently in the Daviess County Jail. He is charged with sexually molesting [H.A.] and [A.A.].

18. Father is denying the charges.

19. Father stated that he had no idea who could have molested the children.

20. [Ro.A.] has also reported sexual molestation at the hands of mother and father.

21. Father reports that [Ro.A.] has a chromosomal disorder, mild autism, and is mildly mentally handicapped.

22. Father denies [Ro.A.'s] allegations as well.

23. Father testified that the children have referred to "touching" in their allegations and father can show that he has been the primary caregiver and has had cause to touch the children in their genital area.

24. Father does not know when his criminal case will end and when he would be available to parent his children.

25. When asked how long the children should have to wait for permanency, father replied that, "he doesn't have an answer".

26.  Father went on to state that there isn't any guarantee that the children would not be molested in an adoptive home.

27.  All of the children have been in therapy.

28.  [H.A.] and [A.A.] have been reported by a therapist to have boundary issues and have exhibited sexualized behavior.

29.  [H.A.] and [A.A.] have trouble expressing feelings and show feelings through aggressive behavior.

30.  [Ro.A.] stated to his therapist that he was forced by father to engage in sexual acts with his sisters, watch pornography, watch his father have sex with his sisters, and watch mom and dad engage in sexual acts.

31.  This trauma has resulted in [Ro.A.'s] sisters being a sexual trigger to him.

32.  [Ro.A.] stated that both his mother and father should be in prison.

33.  The therapist for [Ro.A.] has stated in her opinion [Ro.A.] should not have any further contact with his father.

34.  The Department of Child Services Case Managers along with the children's Court Appointed Special Advocate have all testified that termination of father's parental rights and adoption are in the best interest of the children.

* * * * *

7.  The Court now finds by clear and convincing evidence that the allegations of the petition to terminate parental rights are true in that:

> a.  All four children have been removed from the care and custody of their parents for at least six (6) months after the dispositional decree was placed in the order book.

> b.  There is a reasonable probability that the conditions that resulted in the removal of the [Children] will not be remedied.

> c.  There is [a] reasonable probability that the continuation of the parent-child relationship between the father and his children poses a threat to the well-being of the children.

> d.  Termination of the parent-child relationship between [the Children] and their father is in the best interest of the children.

> e.  The plan of the Department of Child Services for the care and treatment of the children upon termination of father's parental rights is adoption, which is acceptable and satisfactory.

Appellant's App. Vol. II pp. 32-34.

# Analysis

### I. Admission of Evidence

[14]    Father first challenges the admission of certain evidence during the termination hearing. The admission of evidence is entrusted to the sound discretion of the

trial court. *In re S.L.H.S.*, 885 N.E.2d 603, 614 (Ind. Ct. App. 2008). Evidentiary rulings of a trial court are afforded great deference on appeal and are overturned only upon a showing of an abuse of discretion. *Id.* We will find an abuse of discretion if the trial court's decision is against the logic and the effect of the facts and circumstances before the court. *Id.* Moreover, not all trial court error is reversible. *In re Termination of Parent-Child Relationship of E.T.*, 808 N.E.2d 639, 645 (Ind. 2004) (citing Ind. Trial Rule 61). Indiana Trial Rule 61 provides that we must "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Our Supreme Court has held that "[t]he improper admission of evidence is harmless error when the judgment is supported by substantial independent evidence to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the judgment." *E.T.*, 808 N.E.2d at 645-46.

### A. Testimony of Therapists

[15] Father challenges the admission of certain testimony by the Children's therapists, Martin and Williams. Martin was the therapist for H.A. and A.A., and Williams was the therapist for Ro.A. Over Father's hearsay objection, Martin testified regarding H.A.'s and A.A.'s statements to her regarding Father's alleged molestation of the girls. Over Father's hearsay objection, Williams testified regarding Ro.A.'s statements to her regarding Father's and Mother's alleged molestations of him.

[16] A hearsay statement is one "other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the

matter asserted." Ind. Evidence Rule 801(c). Hearsay statements are not admissible, except pursuant to certain exceptions within the Rules of Evidence. Ind. Evidence Rule 802. One such exception, which DCS argues is applicable here, "generally permits statements made for the purpose of medical diagnosis or treatment to be admitted into evidence, even when the declarant is available." *VanPatten v. State*, 986 N.E.2d 255, 260 (Ind. 2013) (citing Ind. Evidence Rule 803(4)). The statements must be "made by persons who are seeking medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." *Id.* "Rule 803(4)'s exception is grounded in a belief that the declarant's self-interest in obtaining proper medical treatment makes such a statement reliable enough for admission at trial—more simply put, Rule 803(4) reflects the idea that people are unlikely to lie to their doctors because doing so might jeopardize their opportunity to be made well." *Id.*

[17] "This belief of reliability, though, necessitates a two-step analysis for admission under Rule 803(4)." *Id.* "First, 'is the declarant motivated to provide truthful information in order to promote diagnosis and treatment,' and second, 'is the content of the statement such that an expert in the field would reasonably rely on it in rendering diagnosis or treatment.'" *Id.* (quoting *McClain v. State*, 675 N.E.2d 329, 331 (Ind. 1996)). "Statements made by victims of sexual assault or molestation about the nature of the assault or abuse—even those identifying the

perpetrator—generally satisfy the second prong of the analysis because they assist medical providers in recommending potential treatment . . . ." *Id.*

> But in cases like the one here, where the declarant is a young child brought to the medical provider by a parent, we have acknowledged that such an inference may be less than obvious. Such young children may not understand the nature of the examination, the function of the examiner, and may not necessarily make the necessary link between truthful responses and accurate medical treatment. In that circumstance, "there must be evidence that the declarant understood the professional's role in order to trigger the motivation to provide truthful information." This evidence does not necessarily require testimony from the child-declarant; it may be received in the form of foundational testimony from the medical professional detailing the interaction between him or her and the declarant, how he or she explained his role to the declarant, and an affirmation that the declarant understood that role. But whatever its source, this foundation must be present and sufficient.

*Id.* at 261 (internal citations omitted).

[18] Father argues that H.A. and A.A. did not understand Martin's role in order to trigger the motivation to provide truthful information. Martin testified that she explained her role as therapist to H.A. and A.A., explained what therapy was, and explained the importance of telling the truth. Martin stated that the girls seemed to understand the importance of telling the truth. When asked if the girls understood the purpose and goal of therapy, Martin responded: "[Y]es and no. I think just with their ages sometimes it's hard for them to understand what therapy is. But I think that they understood that I was someone there that was supposed to be able to help them process things." Tr. Vol. II p. 47. Although

the girls' young age made it difficult for them to completely understand therapy, according to Martin, they understood that Martin was there to help them process events that happened to them and understood the need to be truthful. Under these circumstances, the girls' statements were reliable, and the trial court did not abuse its discretion by admitting Martin's testimony regarding the girls' statements to her.

[19] As for Williams' testimony, Father argues that Ro.A. had no concept of truthfulness and did not understand the purpose of therapy. Williams testified that she explained her role as a therapist to Ro.A. in terms of being a "helper coming to help him feel better." *Id.* at 77. Ro.A. often colored pictures for Williams and addressed them as: "For my therapist." *Id.* at 85. Williams had discussions with Ro.A. about the importance of being truthful, and Ro.A. "seem[ed] to understand" the concept of truth. *Id.* at 77-78. Williams played a game with Ro.A. to explain the difference between a truth and a lie. Williams explained that, prior to meeting with her, it did not appear that Ro.A. "had any understanding of truth and lie." *Id.* at 87.

[20] Father's argument focuses on Williams' testimony regarding Ro.A.'s lack of understanding of truthfulness prior to working with Williams; Williams, however, made it clear that she worked with Ro.A. to explain truthfulness to him, and he seemed to understand. Under these circumstances, Ro.A.'s statements were reliable, and the trial court did not abuse its discretion by admitting Williams' testimony regarding Ro.A.'s statements to her.

### B. Whalen's Testimony

[21] Father argues that the trial court abused its discretion by admitting Whalen's testimony regarding the foster mother's statements to her. Whalen, a community resource specialist with Southwestern, testified that, according to the foster mothers, one of the girls exposed or pulled down another foster child's underwear and one of the girls got on another girl in a "humping position." Tr. Vol. II p. 44.

[22] Father argues that this evidence is not admissible under the medical diagnosis or treatment exception of Evidence Rule 803(4) because the information came from the foster mother, not the girls. DCS "does not dispute this." Appellee's Br. p. 24. DCS, however, argues that the evidence is admissible because "the purpose is to show the effect that the statement had on the listener." *Id.* at 25 (citing *Whited v. State*, 645 N.E.2d 1138, 1140 (Ind. Ct. App. 1995); *Bottoms v. B&M Coal Corp.*, 405 N.E.2d 82, 96 (Ind. Ct. App. 1980)).

[23] We do agree with Father that the trial court erred in admitting Whalen's testimony regarding foster mother's statements. The statements do not fall within one of the hearsay exceptions. We find, however, that any error in the admission of the evidence is harmless. DCS introduced substantial admissible evidence of the Children's statements to their therapists regarding Father's alleged actions. The admission of very brief testimony regarding foster mother's observations of sexualized behaviors did not impact Father's substantial rights. This evidence was not germane to the ultimate issues before the court.

### C. Exhibit F and Exhibit G

Father argues that the trial court abused its discretion by admitting Exhibit F and Exhibit G, which were H.A.'s and A.A.'s medical records from Southwestern. These exhibits were admitted during Martin's testimony over Father's objection. Father contends that the exhibits contain progress notes from another therapist that also worked with H.A. and A.A. and that "there is no foundation laid for A.A. and H.A.'s hearsay statements to the other medical professional." Appellant's Br. p. 18.

DCS argues that any error in the admission of the exhibits was harmless. We note that Father does not point to any specific hearsay statements made to the other medical professional at issue here. Father makes no effort to explain how his substantial rights were impacted by the admission of these exhibits. Given Father's lack of cogent argument, we agree that any error in the admission of the exhibits was harmless.

### B. Family Case Manager's Testimony

Next, Father argues that the trial court abused its discretion by admitting Moore's testimony regarding H.A.'s and A.A.'s statements to her. Moore testified that she first met the Children in 2016 when DCS received a hotline call about the family. Over Father's objection, Moore testified that, upon arriving, H.A. and A.A. almost immediately told Moore that "their Dad was in jail for molesting them." *Id.* at 66.

[27] During the termination hearing, DCS argued that the statement was admissible as an excited utterance. *See* Ind. Evid. R. 803(2). Moore testified that H.A. and A.A. were not "in any kind of significant emotional state" at the time. Tr. Vol. II p. 66. We do not find that this statement qualified as an excited utterance. *See, e.g., Bryant v. State*, 984 N.E.2d 240, 247 (Ind. Ct. App. 2013) (holding that a stabbing victim's statement to an officer was not admissible as an excited utterance where the victim was no longer under the stress of the stabbing when the officer interviewed him).

[28] On appeal, DCS argues that any error in the admission of the statement was harmless. We agree. Father admitted that he had been charged with two counts of child molesting for molesting H.A. and A.A. We have noted that H.A.'s and A.A.'s statements to their therapist that Father molested them were admissible. Consequently, Moore's testimony was cumulative of Father's and Martin's testimony, and any error in the admission of Moore's testimony was harmless. *See, e.g., B.H. v. Indiana Dept. of Child Services*, 989 N.E.2d 355, 363 (Ind. Ct. App. 2013) (holding that, to the extent it was error to admit testimony regarding progress reports, any error was harmless).

## II. *Sufficiency of Evidence to Support Termination*

[29] Father challenges the termination of his parental relationship with the Children. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is

'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'" *In re K.T.K.,* 989 N.E.2d at 1230 (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[30] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re C.G.,* 954 N.E.2d 910, 923 (Ind. 2011). We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)).

[31] Pursuant to Indiana Code Section 31-35-2-8(c), "The trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" when granting a petition to terminate parental rights.[2] Here, the

---

[2] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

    (a) Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

trial court did enter findings of fact and conclusions of law in granting DCS's petition to terminate Father's parental rights. When reviewing findings of fact and conclusions of law entered in a case involving the termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[32] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (A)　That one (1) of the following is true:
>
> > (i)　The child has been removed from the parent for at least six (6) months under a dispositional decree.

---

(b)　If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

(ii)     The court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii)     The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child.

(B) that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)     The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child; and

(D)    that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

[33]    Father makes three arguments on appeal. First, Father argues that several of the trial court's findings are clearly erroneous. Next, Father argues the trial court's conclusion that the conditions that led to the Children's removal would not be remedied is clearly erroneous. Finally, Father argues the trial court's conclusion that termination of Father's rights is in the best interests of the Children is clearly erroneous.

### A. Findings

[34]    Father challenges several of the trial court's findings of fact. First, Father challenges the trial court's finding that "Father does not know when his criminal case will end and when he would be available to parent his children." Appellant's App. Vol. II p. 33. Father testified that he has been in jail for nineteen months, that he did not know when his trial would occur, that he had no idea when he would be released, and that he could not currently take custody of any of the Children. This finding is supported by the evidence.

[35]    Father next challenges the trial court's finding that "[w]hen asked how long the children should have to wait for permanency, father replied that, 'he doesn't have an answer.'" *Id.* During the evidentiary hearing, Father testified as follows:

Q How long should your children have to wait for you to get out of prison - out of jail, sir?

A Well, I mean, I don't really have that answer. You know, to say if my children should have to wait and then I was found guilty would be – you know, it would be wrong for them. But at the same time for my kids not to wait and be taken out of their homes and separated and adopted into other homes, there's no guarantee that they would be even safe within the homes that they adopted in or anything else. And then I was found not guilty and they wouldn't be a part of my life or their own life and with each of their siblings. It's just unfair.

Tr. Vol. II pp. 34-35. Although the wording of the trial court's finding is slightly different than the language used in the question, the trial court adequately summarized Father's statement—Father does not know how long he will be in jail and how long the Children should have to wait. The trial court committed no error.

[36] Next, Father challenges the trial court's finding that "[a]ll of the children have been in therapy." Appellant's App. Vol. II p. 33. Father concedes that H.A., A.A., and Ro.A. have been receiving psychological therapy, but he argues that Ri.A. has not been receiving therapy. DCS presented evidence that Ri.A. has been receiving speech, physical, and occupational therapies. The trial court's finding is supported by the evidence.

### B. Probability that Removal Conditions will be Remedied

[37] Father next argues that the trial court erred by finding there is a reasonable probability that the conditions that resulted in the Children's removal or the

reasons for placement outside the home of the parents will not be remedied. We first note that Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive. Subsection (b)(2)(B)(iii), which concerns repeated CHINS adjudications, is inapplicable here. Consequently, DCS was required to demonstrate by clear and convincing evidence a reasonable probability that either: (1) the conditions that resulted in the Children's removal or the reasons for placement outside the home of the parents will not be remedied, or (2) the continuation of the parent-child relationship poses a threat to the Children's well-being. The trial court here found both that the conditions resulting in the Children's removal will not be remedied and that the continuation of the parent-child relationship poses a threat to the Children's well-being. Father does not challenge the trial court's finding that the continuation of the parent-child relationship poses a threat to the Children's well-being. By failing to challenge this finding, Father has implicitly conceded the sufficiency of the evidence to support subsection (b)(2)(B)(ii) and has effectively waived review of the trial court's determination under Indiana Code Section 31-35-2-4(b)(2)(B).

[38] Waiver notwithstanding, we will address Father's argument. "In determining whether 'the conditions that resulted in the [Child's] removal . . . will not be remedied,' we 'engage in a two-step analysis.'" *In re E.M.,* 4 N.E.3d 636, 642-43 (Ind. 2014) (quoting *K.T.K.,* 989 N.E.2d at 1231). "First, we identify the conditions that led to removal; and second, we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* In analyzing this second step, the trial court judges the parent's fitness "as of the

time of the termination proceeding, taking into consideration evidence of changed conditions." *Id.* (quoting *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 152 (Ind. 2005)). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[39] Father's only arguments are that he has been unable to participate in services due to his incarceration and that the family case managers and Court Appointed Special Advocate (CASA) have not been in contact with him outside of court hearings. The Children were initially removed due to Father's incarceration for allegedly sexually abusing two of the Children and Mother's refusal to take custody of the Children, failure to address their medical needs, and failure to provide them with a safe and appropriate home. Father was charged with molesting H.A. and A.A., and those charges are pending. During the proceedings, Ro.A. also accused Father of molesting him and forcing him to participate in sexual activity with H.A. and A.A. Ro.A. disclosed to his therapist many disturbing instances of abuse. Ro.A.'s therapist recommended that Ro.A. have no further contact with Father. Given the significant allegations of sexual abuse of H.A., A.A., and Ro.A. by Father, the trial court's conclusion that there is a reasonable probability that those conditions will not be remedied is not clearly erroneous.

## C.  Children's Best Interests

[40]  Father next challenges the trial court's determination that termination is in the best interests of the Children.  In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence.  *See In re A.B.,* 887 N.E.2d 158, 167-68 (Ind. Ct. App. 2008).  In doing so, the trial court must subordinate the interests of the parents to those of the child involved.  *Id.* at 168.  Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened.  *K.T.K.*, 989 N.E.2d at 1235.  A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship.  *Id*.  Additionally, a child's need for permanency is a "central consideration" in determining the best interests of a child.  *Id.*

[41]  Father argues that he has maintained his innocence in the criminal case and that he could be "found innocent on his criminal charges but have lost the rights to his children."  Appellant's Br. p. 24.  Father also argues that a best interest determination should not be based solely on the recommendations of the family case managers and the CASA.  Father focuses on the family case managers and CASA's lack of contact with him during his incarceration.

[42]  We agree that a best interest determination cannot be supported solely on the recommendations of the family case managers and CASA.  We have held that "[r]ecommendations of the case manager and court-appointed [special] advocate, *in addition to evidence that the conditions resulting in removal will not be*

*remedied*, are sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014) (emphasis added), *trans. denied*. There is no indication, however, that the trial court based its best interest conclusion on only the opinions of the family case managers and the CASA. Moreover, Father's argument focuses on himself and the lack of contact by the family case managers and CASA with himself. The issue here, however, is the best interests of the Children.

[43] The Children have been out of Father's care since July 2016, when he was charged with molesting H.A. and A.A. Since that time, Ro.A. has disclosed extremely disturbing allegations of additional abuse. Both family case managers testified that adoption was in the Children's best interests due to Father's ongoing incarceration and the nature of the charges. The CASA also recommended adoption because the Children needed permanency and stability. H.A., A.A., and Ro.A. have each needed significant therapy to address their behaviors and to process the trauma they have suffered. Although they have each made progress, the Children need permanency, stability, and a safe environment. Under the totality of the circumstances, the trial court's finding that termination of Father's parental rights is in the Children's best interests is not clearly erroneous.

# Conclusion

[44] The trial court's termination of Father's parental rights is not clearly erroneous. We affirm.

Affirmed.

Baker, J., and May, J., concur.